**PYRAMID LAKE PAIUTE TRIBE OF INDIANS, Plaintiff–Appellant,**

v.

**UNITED STATES DEPARTMENT OF The NAVY; James Webb, as Secretary of the Navy, Defendants–Appellees.**

No. 88–1650.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 6, 1989.

Decided March 19, 1990.

1412

Robert C. Pelcyger, Fredericks & Pelcyger, Boulder, Colo., for plaintiff-appellant.

Donald A. Carr, Acting Asst. Atty. Gen., Fred R. Disheroon, Robert L. Klarquist, and Elizabeth Ann Peterson, Attys., U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for defendants-appellees.

Before TANG, CANBY and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must determine whether certain practices of the Department of the Navy in leasing acreage and contiguous water rights to local farmers in Nevada violate federal law. The Pyramid Lake Paiute Tribe of Indians alleges that these practices seriously threaten the continued viability of an endangered species of fish, the cui-ui, in violation of the Endangered Species Act. The Tribe also alleges that the Navy's practices violate the National Environmental Policy Act as well as the Navy's fiduciary obligations to the Tribe.

I

The Department of the Navy (the "Navy") owns and operates Fallon Naval Air Station ("Fallon") in Nevada. Located within the Carson Division of the Newlands Reclamation Project (the "Project"), Fallon contains nearly 3,000 acres of Project water right land.

The Navy conducts extensive flight training throughout most of the year at Fallon. As a result, the station is the site for hundreds of aircraft and repeated takeoffs and landings. The remote desert location of Fallon provides the Navy with certain training capabilities not available at any other naval facility. Fallon faces certain unique dangers, however, because of the desert conditions. For example, the Navy must contend with poor visibility caused by dust storms, damage to aircraft engines from foreign objects, and an increased risk of fire.

To diminish the risk of these dangers occurring, the Navy has surrounded the runways with "buffer zones" containing irrigated vegetation. These zones work to minimize the dangerous conditions and therefore lessen the risk of injury or death to Navy pilots. To maintain vegetation in the zones, the Navy has leased out since the 1950s approximately 2,200 acres of its Project water right land to local farmers (the "outlease program").[1] This land typically has been used as pasture land or to grow alfalfa, wheat grass, fescue "or other low water use crops."[2]

The diversion of water used to irrigate the land involved in the outlease program is not controlled by the Navy, but rather, by the Truckee–Carson Irrigation District ("TCID"). The diversion occurs as follows:

> [The Project] diverts water from the Truckee River into the Truckee Canal at Derby Dam. The diverted water flows through the Truckee Canal into Lahontan Reservoir, where it is merged with water from the Carson River. Of course, any water that is diverted into

---

1. Since its inception, and up through 1988, the Navy's outlease program has involved one-year leases. However, the Navy has proposed the use of longer-term leases for the future. The Navy and the Tribe entered into an agreement to defer pursuing or implementing the long-term lease proposal until after a study designed to examine alternatives to the outlease program was completed. The study was completed in December 1986, and the Navy has since been reviewing it in light of "the long-term measures it can take for the continued safe operations of [Fallon]."

2. The parties stipulated that the zones could support crops which "would probably" require less Project water than is necessary for the crops currently grown and still serve the Navy's military objectives.

Lahontan Reservoir does not enter Pyramid Lake. . . .

Pyramid Lake is located on the Pyramid Lake Indian Reservation, which is inhabited by the [Tribe]. Drainage from the Truckee River into Lahontan Reservoir has significantly reduced the size of Pyramid Lake.

*Truckee–Carson Irrigation Dist. v. Department of Interior,* 742 F.2d 527, 529 (9th Cir.1984), *cert. denied,* 472 U.S. 1007, 105 S.Ct. 2701, 86 L.Ed.2d 717 (1985).

Before the upstream diversions for the Project as well as for other irrigation and municipal and industrial uses began, the Truckee River maintained the lake's level and provided river spawning flows for the cui-ui, a species of fish which has as its exclusive habitat Pyramid Lake. The Secretary of the Interior (the "Secretary") has categorized the cui-ui (pronounced "kweewee") as an endangered species under the Endangered Species Act (the "Act" or "ESA"). 32 Fed.Reg. 4001 (1967). The parties do not dispute this categorization; indeed, they stipulate that "inadequate flows" of the Truckee River into Pyramid Lake have led to a "precarious condition" for the cui-ui.

In an effort to improve the cui-ui's condition, the United States Fish & Wildlife Service (the "FWS") developed a Cui–Ui Restoration Program aimed at generating a self-sustaining population of the fish through natural reproduction. The key goal of the Restoration Program is to increase the water level of Pyramid Lake.[3] The parties recognize that "[a]dditional flows in the lower Truckee River and into Pyramid Lake are required to insure the survival of the cui-ui as a species" and that "greater flows are required to conserve and recover the cui-ui and to bring them to the point where they are no longer endangered or threatened." Stipulated Fact 4.[4]

In March 1986, the Tribe filed a complaint in federal district court seeking to enjoin the Navy's outlease program at Fallon.[5] The Tribe alleges that the Navy's program imperils the continued viability of the cui-ui by contributing to a significant decrease in the water level of Pyramid Lake. The Tribe argues that the Navy's acts violate not only various provisions of the ESA, but also the National Environmental Policy Act ("NEPA") and the federal government's fiduciary obligation to the Tribe. The Tribe therefore urges that injunctive relief to protect the cui-ui as well as the Tribe's own interests is appropriate. After the court denied the Tribe's motion for a preliminary injunction, and before

3. The parties stipulate that, under the Restoration Program, "[w]ater is needed for three purposes: (1) to attract the spawning population to the mouth of the Truckee River where they are captured for the Tribe's cui-ui hatchery or allowed to pass on to the lower Truckee River for natural spawning; (2) to provide the proper water temperatures and volumes for natural spawning in the river; and (3) to maintain or increase the level of, and the quality of the water and habitat in, Pyramid Lake. Maintaining or increasing the level of Pyramid Lake also serves the important purpose of providing clearance for cui-ui spawners over the delta at the mouth of the Truckee River." Stipulated Fact 3.

4. In addition, the Secretary has been in the process of updating detailed operating criteria and procedures ("OCAP") "for coordinating operation and control of the Truckee and Carson Rivers to provide service to the Newlands Project"; *Pyramid Lake Paiute Tribe v. Morton,* 354 F.Supp. 252, 261 (D.D.C.1973). The Secretary's final version of OCAP is now complete and is one of two documents the Navy has included in an addendum to its brief.

On April 7, 1989, the Clerk of the Court granted the Tribe's motion to strike from the record the materials included in the addendum as well as all references to those materials in the Navy's brief. The materials so stricken consist of the final OCAP report as well as a document generated by the FWS, both of which pertain to potential long-term consequences to endangered species, including the cui-ui, of the Navy's continued exercise of its water rights. Both documents are dated subsequent to the district court's final judgment, and thus, neither was before the district court when it made its decision.

We do not disturb the Clerk's order. Documents lodged with the clerk do not form a part of the record on appeal. *See Zayas–Marini v. INS,* 785 F.2d 801, 805 (9th Cir.1986).

5. The Tribe's complaint names as defendants the Department of the Navy as well as the Secretary of the Navy. We will refer to defendants-appellees collectively as the "Navy."

trial, the parties stipulated to most of the facts pertinent to decision in this case.

Based on these stipulations and its own findings of fact,[6] the district court held that the Navy's actions do not place the cui-ui in "jeopardy" under section 7(a)(2) of the Act. The court further held that because the Navy was not jeopardizing the continued viability of the cui-ui, its failure to develop an environmental impact statement ("EIS") analyzing the outlease program does not violate the NEPA. For the same reasons, the court held that the Navy did not breach its fiduciary obligations to the Tribe. Finally, the court found that while section 7(a)(1) of the Act imposes an affirmative duty on non-Interior federal agencies to use their authority to conserve endangered species, that duty does not rise to the level of duty imposed upon the Interior Department. The court held that non-Interior agencies are entitled to "some discretion." It then ruled that the Navy did not abuse this discretion so as to violate section 7(a)(1) in refusing to adopt the conservation measures the Tribe proposed, finding that the proposals would be not only costly to implement but also largely ineffectual. The district court thus entered judgment for the Navy.

The Tribe timely appeals.

## II

■ Judicial review of administrative decisions involving the ESA is governed by section 706 of the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 981 (9th Cir.1985). Under section 706, the reviewing court must satisfy itself that agency decisions are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

6. In addition to the facts to which the parties stipulated, the district court also found certain additional facts to be established by a preponderance of the evidence.

7. For purposes of the Act, a federal agency is "any department, agency, or instrumentality of the United States." 16 U.S.C. § 1532(7).

8. In relevant part, section 7(a)(2) provides that:

with law." 5 U.S.C. § 706(2)(A); *Friends of Endangered Species, Inc.,* 760 F.2d at 981–82. The relevant inquiry is whether the agency " 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.' " *Friends of Endangered Species, Inc.,* 760 F.2d at 982 (quoting *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983)). We review *de novo* the district court's application of this standard, as well as its legal conclusions under the ESA. *See Animal Defense Council v. Hodel,* 840 F.2d 1432, 1435–36 (9th Cir.1988), *amended,* 867 F.2d 1244 (9th Cir.1989). We review the district court's findings of fact for clear error pursuant to Fed.R.Civ.P. 52(a).

■ An agency's construction of the laws it administers is accorded considerable weight. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.*

## III

### A

■ The Tribe contends that the Navy violated its obligations under section 7(a)(2) of the ESA. Under that section, federal agencies[7] are required to ensure that their actions will not be likely to jeopardize the continued existence of any endangered or threatened species, or to destroy or adversely modify the critical habitat of such species. Endangered Species Act § 7(a)(2) (hereinafter "ESA"), 16 U.S.C. § 1536(a)(2);[8] *see also* 50 C.F.R.

Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be crit-

§ 402.01(a) (1988). An action jeopardizes the continued existence of a species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (1988).[9]

Each agency contemplating an action likely to affect a listed species must first confer with either the FWS or the National Marine Fisheries Service ("NMFS") before taking the action. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.01(b), 402.12 (1988). Cui-ui fall under the jurisdiction of the FWS for consultative purposes. 50 C.F.R. §§ 222.23(a), 227.4, 402.01(b) (1988).[10]

Here, the Navy properly consulted with the FWS before entering into each of the series of one-year leases for the buffer zone areas. Each year, the FWS responded by issuing a biological opinion [11] stating that based on the Service's investigation, the Navy's proposed actions under the outlease program would not jeopardize the cui-ui. The Navy relied in large measure on these FWS opinions in finding that the outlease program would not jeopardize any threatened or endangered species.

 However, while consultation with the FWS may have satisfied the Navy's *procedural* obligations under the ESA, the Navy may not rely solely on a FWS biological opinion to establish conclusively its compliance with its *substantive* obligations under section 7(a)(2). *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1459–60 (9th Cir.1984), *cert. denied*, 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985). A federal agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species; its decision to rely on a FWS biological opinion must not have been arbitrary or capricious. *Id.* Nonetheless, even when the FWS's opinion is based on "admittedly weak" information, another agency's reliance on that opinion will satisfy its obligations under the Act if a challenging party can point to no "new" information— *i.e.*, information the Service did not take into account—which challenges the opinion's conclusions. *Id.*

The Tribe argues at length that the FWS's biological opinions which contain the "no jeopardy" findings are based on faulty analyses. For example, the Tribe states that the "*FWS*[ ] clearly violated its own express regulations by ignoring the 'indirect effects' of the Navy's agricultural leases." Appellant's Brief at 15 (emphasis added).[12] In this regard, the Tribe relies heavily on *Conner v. Burford*, 848 F.2d 1441 (9th Cir.1988). In *Conner*, this court held that the FWS violated its charge under section 7(a)(2) to prepare biological opinions based on the best data available when it evaluated only the first stage of a proposed agency action and ignored information relating to subsequent stages. *Id.* at 1453–54.

The Tribe's argument misses the mark, however, because the FWS is not a party to this action. The FWS's actions, or lack thereof, in preparing its opinions are relevant on appeal only to the extent that they demonstrate whether *the Navy's* reliance on the reports is "arbitrary and capricious." *Stop H-3 Ass'n*, 740 F.2d at 1460.

---

ical,.... In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.
16 U.S.C. § 1536(a)(2).

**9.** A listed species is any species that has been determined to be either endangered or threatened under the Act. 50 C.F.R. § 402.02 (1988).

**10.** The FWS and NMFS share responsibilities for administering the Act. The NMFS has responsibility with respect to all listed species mentioned in 50 C.F.R. §§ 222.23(a) and 227.4. The FWS has responsibility as to all species not so mentioned. 50 C.F.R. § 402.01(b) (1988). The cui-ui is not listed in either section and thus falls within the jurisdiction of the FWS. *See* 50 C.F.R. §§ 222.23(a), 227.4 (1988).

**11.** The Secretary has defined a biological opinion as "the document that states the opinion of the Service as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02 (1988).

**12.** The Secretary defines "indirect effects" as "those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." 50 C.F.R. § 402.02 (1988).

Here, the Tribe has not put forth new information which the FWS did not take into account in rendering its opinion. Moreover, the record contains no other data which undermines seriously the FWS's opinions. Thus, the Navy's reliance on the opinions in executing the outlease program and ensuring compliance with section 7(a)(2) was not arbitrary or capricious.[13]

**B**

▬▬▬ The Act also provides, in section 7(a)(1), that federal agencies outside the Interior Department shall execute their programs in a manner consistent with the conservation of endangered and threatened species. ESA § 7(a)(1), 16 U.S.C. § 1536(a)(1). In full, section 7(a)(1) provides:

> The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. *All other federal agencies* shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of [the Act] by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1553 of this title.

16 U.S.C. § 1536(a)(1) (emphasis added). Similar mandates are laid down in other sections of the Act. *See Carson–Truckee Water Conservancy Dist. v. Clark*, 741 F.2d 257, 261–62 & n. 3 (9th Cir.1984), *cert. denied*, 470 U.S. 1083, 105 S.Ct. 1842, 85 L.Ed.2d 141 (1985) (hereinafter *"Carson–Truckee WCD"*); ESA §§ 2(b), (c), & 3(3), 16 U.S.C. §§ 1531(b), (c), & 1532(3).[14] The key term in these sections, "conservation," means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the Act] are no longer necessary." ESA § 3(3), 16 U.S.C. § 1532(3).[15] This court has recog-

---

**13.** The Tribe also asserts that the Navy's refusal to seek a biological opinion addressing the long-term effects of the outlease program was arbitrary and capricious. As the district court noted, however, the Navy's decision to engage in annual consultations with the FWS "arose, only after its initial long term program was put into abeyance by the filing of this action."

**14.** Section 2(b) states that the purposes of the Act are: "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be *conserved*, [and] to provide a program for the *conservation* of such endangered species and threatened species...." 16 U.S.C. § 1531(b) (emphasis added).

Section 2(c) of the Act provides in pertinent part that: "all Federal departments and agencies shall seek to *conserve* endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the Act]." 16 U.S.C. § 1531(c) (emphasis added).

**15.** A threshold issue is whether the Navy, as an agency outside the purview of the Interior Department, should be held to somewhat of a lesser duty to conserve than those agencies within the Department. The issue suggests itself because of the differing language of sections 7(a)(1) and 2(c)(1) of the Act. Both sections discuss the duty to conserve in nearly identical terms. *Compare* § 7(a)(1) (agencies shall "utilize their authorities in furtherance of the purposes of [the Act] by carrying out programs for the conservation of endangered species") *with*

§ 2(c)(1) (agencies shall "seek to conserve endangered species ... and shall utilize their authorities in furtherance of the purpose of [the Act]"). However, section 7(a)(1) differentiates between the Secretary and "[a]ll other federal agencies" whereas section 2(c)(1) merely refers to *"all* Federal departments and agencies" (emphasis added).

The district court found that the distinction in section 7(a)(1) mandates separate standards. The court distinguished between cases interpreting "the conservation duty of the Department of Interior" and those interpreting the "non-Department of Interior federal agencies' affirmative duty to conserve." The court's reading implies application of the rule that when a specific and a general provision conflict, the specific terms and language prevail. *See Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163 (1944). That is, section 2(c)(1) is a general declaration of Congress's policy behind the Act, whereas section 7(a)(1) is a specific substantive provision outlining particular requirements. *See also Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 179, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978) (noting that during congressional hearings, witnesses recommended that Congress require "all *land-managing* agencies" to seek to improve habitat of endangered species) (emphasis added).

We opt for an alternate reading. In interpreting language in one section of a statute in conjunction with language of other sections, this court strives to find a reading that is consistent

nized that agencies have affirmative obligations to conserve under section 7(a)(1), but has not had occasion to consider the scope of those obligations. *Carson–Truckee WCD,* 741 F.2d at 262 n. 5.

■ The Tribe asserts that if an alternative to the challenged action would be equally as effective at serving the government's interest, and at the same time would enhance conservation to an equal or greater degree than does the challenged action, then the agency must adopt the alternative. The Tribe suggests in essence that section 7(a)(1) requires an agency to adopt the "least burdensome alternative," to borrow a phrase from constitutional law. The Tribe notes that it proposed an alternative to the current outlease program that would both require the use of less Project water and further the Navy's interest in pilot safety to the same degree. The Navy's refusal to adopt the proposal, the Tribe argues, violates the Navy's affirmative obligation to conserve under section 7(a)(1). The Navy responds that while section 7(a)(1) requires agencies to develop programs that will operate to conserve listed species, the agencies need do so only in a manner consistent with the accomplishment of the agencies' primary goals.

■ In construing a statute, this court first looks to the plain meaning of the language in question. *United States v. Hurt,* 795 F.2d 765, 770 (9th Cir.1986), *amended,* 808 F.2d 707 (9th Cir.), *cert. denied,* 484 U.S. 816, 108 S.Ct. 69, 98 L.Ed.2d 33 (1987) (citing *North Dakota v. United States,* 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983)). If the language is unambiguous, its plain meaning controls unless Congress has "clearly expressed" a contrary legislative intent. *Id.*

In *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the Supreme Court examined the legislative history of the ESA. There, to conserve an endangered species of fish, the Court enjoined the TVA from completing construction of a dam which had commenced before the enactment of the latest version of the ESA and on which the federal government had spent over $50 million. *Id.* at 195, 98 S.Ct. at 2302. In so doing, the Court stated that "[t]he plain intent of Congress in enacting [the ESA] was to halt *and reverse* the trend toward species extinction, *whatever the cost."* *Id.* at 184, 98 S.Ct. at 2297 (emphases added); *see also id.* at 174, 98 S.Ct. at 2291 (stating that the Court's "examination of the language, history, and structure of [the Act] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities"); *see generally* Comment, "Habitat Conservation Plans Under the Endangered Species Act," 24 San Diego L.Rev. 243 (1987) (section on the legislative history of the ESA and its predecessor Acts).

The Court's discussion of the Act in *TVA* makes clear that, on the one hand, the Navy's "primary mission" construction is not viable because it understates the Navy's duty to conserve. The Navy concedes that section 7(a)(1) contains a congressional directive that agencies must act affirmatively in the interest of listed species, but qualifies the declaration by stating that the section was not "intended to frustrate the agencies' accomplishment of their primary missions." Appellee's Brief at 20. The Court in *TVA* rejected such a proposition as being inconsistent with congressional intent. *TVA,* 437 U.S. at 181–83, 98 S.Ct. at 2295–96 (noting that Con-

with the purposes of the entire statute considered as a whole. *Adams v. Howerton,* 673 F.2d 1036, 1040 (9th Cir.), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982). Here, sections 2(c)(1) and 7(a)(1) can be read consistently and without conflict by noting that the latter merely points out that in exercising their duty to conserve, non-Interior Department agencies must do so in consultation with the Secretary. After all, it would have made no sense for Congress to have required the Interior

Department, as lead agency for implementing the Act, to consult with itself. *See also TVA,* 437 U.S. at 185, 98 S.Ct. at 2297 (finding a "conscious decision by Congress to give endangered species priority over the 'primary missions' of *federal agencies"* in general) (emphasis added); H.R.Rep. No. 93–412, p. 14 (1973) (stating that § 7 "requires the Secretary and the heads of all other Federal departments and agencies to use their authorities in order to carry out programs for the protection of endangered species").

gress "carefully omitted" from the final version of the Act all proposed language which tempered federal agencies' duty to conserve (e.g., language which extended the duty only "insofar as is practicable and consistent with the[ir] primary purposes")) (emphasis, brackets in original).[16]

■ On the other hand, the Tribe's interpretation overstates the Navy's duty, for it would work to divest an agency of virtually all discretion in deciding how to fulfill its duty to conserve. We have recognized that the Secretary is to be afforded some discretion in ascertaining how best to fulfill the mandate to conserve under section 7(a)(1). See Carson–Truckee WCD, 741 F.2d at 262.[17] That some discretion should be allowed is also evident from the regulations promulgated under the Act. For example, a non-Interior agency is given discretion to decide whether to implement conservation recommendations put forth by the FWS. 50 C.F.R. § 402.14(j) (1988).[18] The interpretation of a statute by the agency charged with its administration is entitled to deference. Chevron U.S.A., Inc., 467 U.S. at 844, 104 S.Ct. at 2782.

In addition, we do not read TVA to compel adoption of the Tribe's interpretation of section 7(a)(1). As the Court's only comprehensive discussion of the ESA, TVA is undoubtedly instructive to our analysis.

We see, however, at least one crucial difference between the situation the TVA faced and that which the Navy faces here. In TVA, it was indisputable that the challenged agency action, completion of the Tellico Dam, "would result in total destruction of the snail darter's habitat." TVA, 437 U.S. at 162, 98 S.Ct. at 2286. Here, the FWS predicts no such grave danger. To the contrary, the FWS reports that the Navy's operation of the outlease program will not jeopardize the cui-ui. Moreover, while the Court in TVA referred to section 7(a)(1), its holding was premised upon section 7(a)(2).

Even were we to adopt the stringent standard of duty the Tribe would impose, we would be hard-pressed to rule that the Navy has violated section 7(a)(1) given the district court's findings of fact. Our reasoning hinges primarily on the court's finding that the Tribe's proposals would be of "insignificant effect upon the availability of water in the lower Truckee River for the preservation of the cui-ui."[19]

An "insignificant" conservation measure in the context of ESA is oxymoronic; if the proposed measure will be insignificant in its impact, how can it serve the ends of conservation, and thus be a "conservation measure"? To require an agency to imple-

---

**16.** We note that the Act has been changed since issuance of the TVA opinion suggesting that Congress has modified its previous policy that species be preserved at all cost. For example, unlike at the time of the TVA opinion, exceptions to section 7(a)(2) may now be granted by the newly created Endangered Species Committee. See 16 U.S.C. §§ 1536(e) to 1536(h).

**17.** We do not ascribe significant weight to this pronouncement, however, because in Carson–Truckee WCD, the Secretary's acts under review were conservation measures; indeed, the "outside" plan he rejected was less protective of endangered species.

**18.** In full, the regulation provides: "Conservation recommendations. The Service may provide with the biological opinion a statement containing discretionary conservation recommendations. Conservation recommendations are advisory and are not intended to carry any binding legal force." 50 C.F.R. § 402.14(j) (1988).

**19.** Factfinding 32 states in relevant part that:

> The halfway measure, proposed by plaintiff, of requiring the planting of a cover crop such as tall wheat grass is unacceptable because there will be few, if any, applicants for agricultural leases restricted to tall wheat grass, or similar forage. Adoption of such a program would have an *insignificant* effect upon the availability of water in the lower Truckee River for the preservation of the cui-ui. Only approximately 5,000 acre feet of water might theoretically be reduced from the Newlands Project demand at the Derby–Truckee Canal diversion (emphasis added).

Factfinding 34 states:

> 34. Two other proposals of plaintiff (1) that the Navy should be required to abandon its water rights and divert water from the drainage canals; or (2) that the Navy should be required to obtain ground water permits from the State Engineer of Nevada and pump water from wells into a sprinkler irrigation system are too exhorbitantly expensive and *of unproven utility and practicability* to justify consideration (emphasis added).

ment such a measure would be ill-advised. This position is not only consistent with reasoned public policy, but also coincides with the wording of the Act, which, as noted above, defines "conserve" to mean "the use of all methods and procedures which are *necessary* to render a species no longer subject to the label "endangered." 16 U.S.C. § 1532(3) (emphasis added).

The Tribe relies on Stipulated Fact 30, which states that "[e]liminating or significantly reducing the use of direct deliveries of Newlands Project water to [Fallon] would promote conservation of the endangered cui-ui...." The Stipulation, however, does not deal with the *degree* to which such reduction would promote conservation, nor does it establish that it would be the only method by which the Navy could promote conservation of the cui-ui.

The district court found that the Tribe's proposal would have only an "insignificant effect upon the availability of water in the lower Truckee River for the preservation of the cui-ui." We find no direct conflict between this finding and Stipulated Fact 30. Nor do we, in light of our earlier discussion of the Navy's duty under section 7(a)(1), agree that any slight conservation effect, however insignificant, requires the Navy to accept the Tribe's proposal.

Given the district court's findings, the Navy did not abuse its discretion or act arbitrarily, capriciously, or otherwise not in accordance with law in its rejection of the Tribe's alternative plans specifically, or in its operation of the outlease program generally. *See* 5 U.S.C. § 706(2)(A). The Navy has foregone plans to lease out the full portion of land with appurtenant water rights since entering into the 1985 agreement with the Tribe. The Navy has begun consultations with the FWS concerning a long-term outlease program and has hired

experts to conduct a study of water conservation alternatives, which has now been completed. Moreover, the Navy represents to this court that it "will reduce its planned consumption of irrigation water and require improvements such as leveling and ditch lining to increase efficiency and reduce water loss." Appellee's Brief at 18.

We hold that the district court's finding relating to the insignificant impact of the conservation measures the Tribe has proposed is not clearly erroneous. We therefore affirm the court's holding that the Navy has not violated section 7(a)(1).

## C

The Act forbids any person, including a federal agency, from "taking" any endangered species. ESA §§ 3(13), 9(a)(1)(B), 16 U.S.C. §§ 1532(13), 1538(a)(1)(B).[20] To "take" an endangered species in this context includes to "harm," ESA § 3(19), 16 U.S.C. § 1532(19), which in turn the Secretary has defined as follows:

"Harm" in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3 (1987).

The Tribe argues that the Navy's outlease program significantly impairs the essential spawning of the cui-ui because of the diversion of Project water which attends its operation. According to the Tribe, the diversions lower the water level of the Lake, and consequently, the clearance at the delta between the Lake and the Truckee River, up which the fish must travel to spawn. In its argument, the Tribe relies primarily on this court's recent opinion in *Palila v. Hawaii Dept. of Land &*

---

**20.** In relevant part, section 9(a)(1)(B) provides that: "[Subject to certain exceptions not relevant here], with respect to any endangered species ... it is unlawful for any person subject to the jurisdiction of the United States to ... take any such species within the United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1)(B).

Section 3(13) defines "person" as "an individual, corporation, partnership, trust, association, or any other private entity, *or any officer, employee, agent, department, or instrumentality of the Federal Government,* of any State or political subdivision thereof, or of any foreign government." 16 U.S.C. § 1532(13) (emphasis added).

*Natural Resources,* 852 F.2d 1106 (9th Cir. 1988). In *Palila,* this court ruled that habitat degradation that could result in extinction constitutes "harm" under section 9, and that the district court's finding that the challenged action would cause such degradation was not clearly erroneous. *Id.* at 1108, 1110.

Here, the district court did not directly address the issue of whether the outlease program was "harming" the cui-ui under section 9. Rather, the court found that the outlease program was not jeopardizing the cui-ui.[21] Thus, the issue becomes whether the record is complete enough for us to address the question for the first time on appeal, or whether remand is necessary to allow the district court to make the initial determination as to "harm." Given the comprehensiveness of the record, we will address the issue.

The evidence does not establish that any one year's diversions of Project water has actually caused the cui-ui's spawning problems. Moreover, the Tribe fails to distinguish the Navy from other users of Truckee River water. We note that the Tribe itself diverts Truckee River water for its own use. Because the evidence does not demonstrate that the Navy's outlease program has "harmed" the cui-ui, we note that there is no "taking" under section 9(a)(1).

## IV

NEPA requires agencies contemplating actions with significant effects on the human environment to prepare environmental analyses. 43 U.S.C. § 4332(c). Agencies may first prepare an environmental assessment ("EA") to determine whether a proposed action would have such an effect. 40 C.F.R. § 1508.9. If the agency determines that the proposed action will not significantly affect the environment, it may publish a Finding of No Significant Impact ("FONSI") and then execute its action. Agencies may also develop "categorical ex-

clusions" from the EA/EIS requirement, which apply to a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations ... and for which, therefore, neither an environmental assessment nor an environmental impact statement is required." 40 C.F.R. § 1508.4.

The short-term outlease program fits within the Navy's categorical exclusion for actions that continue previous activities without significant changes. As for the long-term outlease program, which concededly is not within the exclusion category, the Navy has not violated NEPA for the simple reason that it has not engaged in any long-term outlease activity. We note that the Navy is currently studying different alternatives with respect to their effect on the environment. We do not reach the question of whether environmental reports on final actions regarding the long-term lease plan will be subject to challenge under NEPA.

## V

■■ The Secretary has a fiduciary duty to preserve and protect the Pyramid Lake fishery. *Pyramid Lake Paiute Tribe v. Morton,* 354 F.Supp. 252, 256 (D.D.C.1972). This court referred approvingly to this duty in *Truckee–Carson Irrigation Dist.,* 742 F.2d at 532, and has read the obligation to extend to any federal government action. *Nance v. EPA,* 645 F.2d 701, 710, 711 (9th Cir.), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). While most cases holding the government to this duty have involved Indian property rights, the government's trustee obligations apparently are not limited to property. *Morton v. Ruiz,* 415 U.S. 199, 236, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); Cohen's Handbook of Federal Indian Law at 225–28 (1982 ed.).

---

**21.** Contrary to the Navy's contention, it should be recognized that these two findings do not overlap perfectly; *i.e.,* there may be some actions that do not jeopardize a species that nonetheless may constitute "harm" under section 9.

Nonetheless, the factual underpinnings are substantially similar for the two findings such that the district court's finding of "no jeopardy" serves to inform the "harm" inquiry.

■ The district court, relying on its "no jeopardy" finding, held that the Navy has not violated its fiduciary duty to conserve the Tribe's fishery. Obviously, a "no jeopardy" finding does not always preclude a finding that an agency has breached its fiduciary duty to the Tribe. Here, however, the two go hand-in-hand. As discussed above with respect to the Navy's affirmative duty to conserve under section 7(a)(1) of the Act, the Navy has taken and is taking steps to conserve water on behalf of the cui-ui and consequently for the Tribe and its fishery. We therefore affirm the district court's holding that the Navy did not breach its fiduciary duty to the Tribe.

## VI

We hold that the Navy's reliance on the FWS biological "no jeopardy" opinions was not arbitrary and capricious under section 7(a)(2) of the Act. Therefore, its refusal to adopt the Tribe's alternative proposal for operation of the outlease program did not violate its affirmative obligation to conserve endangered species under section 7(a)(1) of the Act. Nor did the Navy breach its fiduciary obligations to the Tribe. Finally, the Navy's one-year leases for the buffer zones around Fallon fall reasonably within a categorical exclusion under NEPA. We affirm the district court's judgment for the Navy.

AFFIRMED.