**SAN BERNARDINO VALLEY AUDU-BON SOCIETY; California Trout, Incorporated, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION; Secretary of Agriculture, Respondents,**

**Southern California Edison Company; Bear Valley Mutual Water Company; The City of Redlands, CA; Crafton Water Company; East Valley Water District; North Fork Water Company; San Bernardino Valley Municipal Water District, Respondent–Intervenor.**

No. 05–77186.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 6, 2007.

Filed July 12, 2007.

Adam F. Keats, Center for Biological Diversity, Richard Roos–Collins, Rachel Golden, Esq., Natural Heritage Institute, Lisa T. Belenky, Esq., San Francisco, CA, for Petitioners.

FERC—Federal Energy Regulatory Commission, Carol J. Banta, Esq., John A. Bryson, Esq., DOJ—U.S. Department of Justice Environment & Natural Resources Division, Washington, DC, for Respondents.

Nino J. Mascolo, Esq., Southern California Edison Company Legal Division, Rosemead, CA, James L. Arnone, Esq., Beth Collins–Burgard, Esq., Latham & Watkins, Llp, Los Angeles, CA, Peter C. Kissel, Paige C. Bullard, Esq., Law Offices of Gkrse, Washington, DC, Rhonda Cate Canby, Esq., Downey Brand, Llp, Sacramento, CA, for Respondent–Intervenor.

Before: TROTT and RAWLINSON, Circuit Judges, and KING *, Senior Judge.

## MEMORANDUM **

San Bernardino Audubon Society and California Trout, Inc. (collectively, Audubon) petition for review of FERC's order of July 22, 2003, relicensing the Mill Creek hydroelectric project operated by Southern California Edison (SCE). We affirm.

■ 1. Audubon challenges Article 407, a license condition that requires SCE to release into the bypass reach of Mill Creek only existing leakage flow, as unsupported by substantial evidence. FERC rejected Audubon's seven cfs flow recommendation because FERC's staff found that such a flow was unlikely to establish continuous flows, a substantial vegetation corridor, or suitable conditions for a trout fishery in the bypass reach. In reaching its decision, FERC considered voluminous scientific evidence submitted by Audubon, SCE, and others. That FERC apparently found SCE's evidence more persuasive does not make FERC's decision unsupported by substantial evidence. *See AS-ARCO, Inc. v. OSHA*, 746 F.2d 483, 490

* The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

** This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36–3.

(9th Cir.1984) ("Although we must review contradictory evidence in the record, 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.' ") (citation and quotation omitted); *see also id.* ("Where the agency presents scientifically respectable evidence which the petitioner can continually dispute with rival, and we will assume, equally respectable evidence, the court must not second-guess the particular way the agency chooses to weigh the conflicting evidence or resolve the dispute.") (quoting *United Steelworkers of America v. Marshall,* 647 F.2d 1189, 1263 (D.C.Cir.1980)). On this record, and under our deferential standard of review, we must conclude that FERC's resolution of any factual scientific disputes is supported by substantial evidence, and is therefore conclusive. *See* 16 U.S.C. § 825*l*(b).

■ **2.** Audubon asserts that, in requiring only existing leakage flow, FERC abdicated its duty under § 10(a)(1) of the Federal Power Act (FPA) to ensure that the project is "in the judgment of [FERC] ... best adapted to a comprehensive plan" that incorporates development and non-development purposes, including "the adequate protection, mitigation, and enhancement of fish and wildlife." 16 U.S.C. § 803(a)(1). Audubon argues that FERC improperly balanced the beneficial uses by giving "all of the weight"—as evidenced by giving all of the water—to hydropower. FERC determined that Audubon's recommendation was inconsistent with § 10(a)(1) because such flows were unlikely to enhance habitat in the bypass reach, yet would result in a 40%–50% decrease in power production. Where FERC's conclusion regarding habitat conditions in the bypass reach is supported by substantial evidence, FERC's adoption of Article 407

cannot be found to be inconsistent with § 10(a)(1). Congress entrusted FERC with the authority to balance competing uses, and on these facts, FERC did not misuse that authority. *See Cal. Water Res. Control Bd. v. FERC,* 966 F.2d 1541, 1550 (9th Cir.1992) ("Section 10 of the FPA grants FERC broad authority to weigh the salient factors at issue in granting a license.").

■ **3.** Audubon claims that Article 407 is inconsistent with the San Bernardino Forest Plan (Forest Plan), and the 1995 Santa Ana Basin Plan (Basin Plan). Under FPA § 10(a)(2), FERC "shall consider ... [t]he extent to which the project is consistent with a comprehensive plan (where one exists)" prepared by a state or federal agency. 16 U.S.C. § 803(a)(2).

In concluding that Article 407 was consistent with the Forest Plan, FERC relied on Forest Service's evaluation of a plan it administers. Forest Service stated that the conditions it sought to impose on the project were "consistent with the goals, objectives, standards, and guidelines of the [Forest] Plan." Condition 6 mirrors Article 407. We conclude that FERC's consistency finding was not arbitrary and capricious.

■ As for the Basin Plan, FERC acknowledged that the project was inconsistent with the Basin Plan's coldwater fisheries temperature objective. Audubon cites to no case, and none could be found, holding that FERC must ensure consistency with § 10(a)(2) plans. Furthermore, FERC pointed out that water quality in the bypass reach was good. The Environmental Assessment analyzed extensively the project's impacts on plants and wildlife, and discussed briefly the impacts on recreation in the project area. Thus, while Audubon obviously disagrees with FERC's analysis of the Basin Plan, it cannot be said that FERC ignored its objectives.

■ **4.** We dismiss Audubon's challenge to Forest Service's proposed Condition 6. FERC rejected Condition 6 as an invalid FPA § 4(e) condition because FERC found it concerned either non-Forest lands, or Forest lands outside the project boundary. Because Condition 6 was not incorporated into the license, it has no legal effect, and this court "cannot take jurisdiction over a claim to which no effective relief can be granted." *Headwaters, Inc. v. BLM*, 893 F.2d 1012, 1015 (9th Cir.1990); *see California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 912 (9th Cir.1989) (noting that "[t]he 4(e) conditions imposed by the Service have no significance outside the licensing process").

■ **5.** Audubon argued to FERC and insists on appeal that the license application improperly failed to include a "maintenance plan" for an earthen berm related to the project works. FERC stated below that no such plan was required, and the statute and regulation Audubon cites do not suggest otherwise. Section 808(a)(2)(B) of 16 U.S.C. requires FERC to consider, when deciding between two applicants for the same license, "[t]he plans of [each] applicant to manage, operate, and maintain the project safely." The regulation cited simply requires the license application to describe the project works. 18 C.F.R. § 4.61(c)(viii).

■ **6.** Relying on the Endangered Species Act (ESA), Audubon claims that FERC failed in connection with its reissuance of the license to ensure that the operation of the project is not likely to jeopardize the continued existence of the endangered southwestern willow flycatcher in the project area or adversely affect the bird's critical habitat. We disagree.

The presence of the flycatcher was first brought to the FERC's attention by the United States Department of the Interior,

Office of Environmental Policy and Compliance. In a letter dated October 11, 2001, that office formally notified FERC of the presence of the federally listed flycatcher "above the Mill 3 diversion at Forest Falls." This letter identified the Mill Creek area as "one of the few remaining locations where restoration of substantial amounts of flycatcher habitat is still possible," and the letter recommended immediate informal consultation by FERC regarding a possible biological assessment.

On May 7, 2002, FERC released its draft Environmental Assessment (which it considered to be also a biological assessment) to the Fish and Wildlife Service (FWS). This document, prepared by experts on the issues, addressed the effects of the Mill Creek project on threatened species and/or critical habitat. The document concluded that the relicensing of the project "with our recommended measures is 'not likely to adversely affect' the southwestern willow flycatcher." "Therefore, we do not believe that formal consultation is required. Please tell us in writing within 30 days from the date of receipt of this letter if you do or do not agree with our assessment. Should you need to discuss your concerns before making your determination, please contact [us] to indicate your interest in initiating a teleconference with all parties on this issue."

On August 27, 2002, FWS responded by letter, indicating *inter alia*, "After reviewing the EA and other relevant information, we concur with your conclusion [about the flycatcher] because the effects of the new license (i.e., restored flows in the Mill 2 bypass reach and of 0.75–acre of riparian habitat restoration in the Mill 3 bypass reach) are beneficial compared to the environmental baseline. Future direct and indirect effects of project operation over the license period are not likely to adversely

affect listed species, as none are know to occur within the Mill 3 bypass reach."

On October 29, 2002, Audubon supplied FERC and FWS with a declaration from a qualified research biologist to the effect that he had often seen and heard flycatchers in the bypass reach, but he had observed no nests there. He believed that the flycatcher utilized the bypass reach "on the way to foraging and nesting areas."

On April 1, 2003, FWS responded to the expert's declaration in a letter to FERC, stating that the information in question regarding migration but not nesting had not caused them to reassess its determination.

On April 28, 2003, Audubon replied that the expert had now told them over the telephone that he had seen the flycatcher in the bypass reach during the nesting periods, but that he was too busy to sign a declaration to that effect. The expert also invited FERC's participation in a bird survey of the area to be conducted "on or after June 10."

No declaration was forthcoming from the expert, and the license issued in due course on July 22, 2003.

In an Order Denying Rehearing dated October 20, 2005, FERC explained its handling of the expert's information as follows. We array this explanation as it is necessary to assess whether or not FERC's reasoning was appropriate and reasonable.

76. By letter of October 31, 2002, to FWS, petitioners contested FWS's conclusion that the southwestern willow flycatcher was not known to occur within the bypassed reach. Petitioners attached a declaration from an interim curator of the San Bernardino County Museum, Gerald Braden, that birds of that species fly through and forage in the bypassed reach. Petitioners stated

that Mr. Braden's declaration was based on his participation in surveys conducted by the museum from 1999 to 2002 under contract with the Forest Service and on his own eyewitness observations.

77. By letter of April 1, 2003, to the Commission, FWS noted petitioner's letter and the Braden declaration. FWS explained that the federally-listed southwestern willow flycatcher is one of three or four subspecies of flycatcher that could be present in southern California as transients during migration periods. FWS stated that these species are difficult or impossible to distinguish visually, but that only the southwestern willow flycatcher nests in southern California. FWS concluded that, because the willow flycatcher observations noted in the Braden declaration occurred during migration, the individuals observed could not be positively identified as the federally-listed subspecies. FWS indicated that, at that time, it did not have sufficient information to reassess its determination, but that reconsidering the necessity of consultation under section 7 might be appropriate if southwestern willow flycatchers were confirmed within the bypassed reach during the nesting season.

78. By letter of April 28, 2003, to FWS and the Commission, petitioners stated that Mr. Braden confirmed to them by telephone that he had observed flycatchers in the bypassed reach during the nesting periods of past years and that his prior declaration was intended to describe such observations. Petitioners indicated that they intended to submit Mr. Braden's written declaration to this effect in mid-May 2003. No such declaration was submitted, and Commission staff received no further communication from FWS on this matter. In the July 22, 2003 Relicense Order, staff, noting petitioners' earlier letter and FWS's response, concluded that no new informa-

tion had been provided to warrant initiating further consultation.

79. Petitioners complain that staff's relicense order ignored their April 28, 2003 letter, and they attach to the rehearing request a written declaration of Mr. Braden indicating that he has observed the southwestern willow flycatcher in the bypassed reach during the nesting season. Petitioners state that FWS has not subsequently determined whether to initiate formal consultation, and they assert that, absent such a determination, issuance of the license was not permitted by section 7(a)(2)....

80. The declaration provided by petitioners lacks supporting documentation. The nesting season runs from mid-May through late July. The time period during which it would be safe to assume that the observed species is in fact a southwestern willow flycatcher is a narrow window—roughly June 22 through July 17th. Before or after that window, the unlisted sub-species may be present. Absent direct observations of nesting behavior (such as territorial behavior or nest defense) or evidence of nesting (such as locating active nest or young), the timing of the observation is critical in determining if an observed bird would be a southwestern willow flycatcher. Petitioners provide no dates or locations of observations, and their evidence is insufficient to determine when in the nesting season the observations were made. Therefore, we do not consider the presence of willow flycatchers in the bypassed reach to be conclusively demonstrated.

81. The implementing regulations provide that, if during informal consultation it is determined by the federal agency, with the written concurrence of the Secretary, that the proposed action is not likely to adversely affect listed species, the consultation process is terminated and no further action is necessary. The Commission staff reached such a determination in this proceeding with respect to the southwestern willow flycatcher, and FWS concurred with the determination. Further, FWS declined to reassess its concurrence upon petitioners' initial challenge to it. Under the regulations, the consultation process was completed. That FWS did not respond to petitioners' second challenge to its concurrence cannot be construed, as petitioners imply, as requiring the Commission to await yet another concurrence before issuing the license. The Commission and FWS are not required to extend consultation based on continued submissions from other entities. Standard license article 15 allows the Commission to reopen the license to consider information that might warrant initiating formal consultation in the future.

By the time of the reissuance of the license in 2003, Audubon had not presented evidence to "undermine[ ] seriously" FWS's concurrences. *See Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415–16 (9th Cir. 1990) (noting that an action agency's reliance on a wildlife agency's opinion may be arbitrary and capricious where a petitioner presented new information that seriously undermined the wildlife agency's opinion).

After a thorough review of the record, we cannot conclude that FERC's handling and consideration of the issue was either arbitrary, capricious, or not in accordance with the law. FERC's conclusions were based upon substantial evidence and thus entitled to deference and respect.

Review under the arbitrary and capricious standard is deferential; we will not vacate an agency's decision unless it "has relied on factors which Congress had not intended it to consider, entirely

failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* —— U.S. ——, 127 S.Ct. 2518, 2529–30, 168 L.Ed.2d 467 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

■ 7. Audubon argues that FERC must reinitiate consultation with FWS regarding the project's effects on the endangered southwestern willow flycatcher. Audubon contends that consultation is warranted because *after* FERC issued the license, FWS designated the bypass reach as critical habitat for the flycatcher. *See* 50 C.F.R. § 402.16(d) (requiring reinitiation of consultation "where discretionary Federal involvement or control over the action has been retained or is authorized by law and . . . [i]f a new species is listed or critical habitat designated that may be affected by the identified action"). We are not persuaded by Audubon's arguments because once FERC issued the License Order in 2003, FERC was no longer engaged in agency "action" for ESA purposes.

The ESA consultation requirements are triggered when a federal agency contemplates taking action. *Cal. Sportfishing Prot. Alliance v. FERC,* 472 F.3d 593, 597 (9th Cir.2006); 16 U.S.C. § 1536(a)(2). By definition, "action" includes the granting of a license. 50 C.F.R. § 402.02. Here, FERC's action of renewing SCE's license was concluded in 2003, at which time SCE, a private party, began operating the project pursuant to that license. *See Cal. Sportfishing,* 472 F.3d at 598–99. After renewing the license in 2003, FERC no longer retained "discretionary involvement or control" over the project. *See id.* "The regulations promulgated pursuant to the ESA make it clear that the operation of a project pursuant to a permit is not a federal agency action." *Id.* at 598.

**AFFIRMED.**

RAWLINSON, Circuit Judge, concurring:

I concur in the result.