**CENTER FOR BIOLOGICAL DIVERSITY, et al.,**
**Plaintiffs,**

v.

**Donald H. RUMSFELD, Secretary of Defense, et al., Defendants,**

**Coalition of Arizona/New Mexico Coalition of Countries for Stable Economic Growth, Defendant–Intervenors.**

**No. Civ99–203 TUC ACM.**

United States District Court, D. Arizona.

April 11, 2002.

Eric Ollason, Tucson, AZ, Susan Diane Daggett, Earthjustice Legal Defense Fund, Denver, CO, Mark Edward Hughes, Denver, CO, for Southwest Center for Biological Diversity, San Pedro 100, Robin Silver, plaintiffs.

Jean Williams, Seth M. Barsky, Lisa Lynne Russell, U.S. Dept. of Justice, Wildlife & Marine Resources Section, Washington, DC, Monte C. Clausen, U.S. Attorney's Office, Tucson, AZ, for Government defendants.

Karen Budd-Falen, Brandon L. Jensen, Budd-Falen Law Offices, Cheyenne, WY, for Coalition of Arizona and New Mexico Counties for Stable Economic, defendant.

## ORDER

MARQUEZ, Senior District Judge.

A. *Crossmotions for Summary Judgment*

Plaintiffs sue the United States Fish and Wildlife Service (the FWS) and the Department of the Army (Army) for violation of § 7 of the Endangered Species Act (the ESA), 16 U.S.C. § 1536(a)(2). Plaintiffs argue that the FWS's Final Biological Opinion (Final BO)—concluding that the Army's continued activities at Fort Huachuca, Arizona, will not cause jeopardy to the Huachuca water umbel (a plant) or the Southwestern willow flycatcher (a bird), or adversely modify critical habitat—is arbitrary, and contrary to law.

Plaintiffs seek declaratory judgment that the Final BO is arbitrary and capricious and in violation of the ESA. Plaintiffs seek declaratory judgment that the Army's operations are likely to result in jeopardy to and adverse modification of critical habitat for the willow flycatcher and water umbel, and therefore, the Army is in violation of its independent duty under § 7 of the ESA, 16 U.S.C. § 1536(a)(2), to not cause jeopardy or adverse modification to endangered species.

Defendants seek summary judgment, which they are entitled to as long as the FWS's decision was based on consideration of the relevant factors, and the FWS articulated a rational connection between the facts found and its decision. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *LaFlamme v. FERC,* 852 F.2d 389, 399 (9th Cir.1988); *Pyramid*

*Lake Paiute Tribe v. United States Dept. of Navy,* 898 F.2d 1410, 1413 (9th Cir. 1990). Furthermore, Defendants assert that the Army did not violate its substantive obligation under § 7(a)(2) to ensure that its actions at Fort Huachuca are not likely to jeopardize the continued existence of the water umbel and flycatcher or to adversely modify flycatcher critical habitat. The Army may rely on the FWS's Final BO to satisfy this substantive obligation as long as its reliance on the Final BO is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Stop H–3 Association v. Dole,* 740 F.2d 1442, 1459 (9th Cir.1984), cert. denied, 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985); *Aluminum Company of America v. Bonneville Power Admin.,* 175 F.3d 1156, 1160 (9th Cir.1999), cert. denied, *Columbia Falls Aluminum Co. v. Bonneville Power Administration,* 528 U.S. 1138, 120 S.Ct. 983, 145 L.Ed.2d 933 (2000); *Pyramid Lake Paiute Tribe,* 898 F.2d at 1415.

B. *Plaintiffs' Motion for Summary Judgment*

Plaintiffs write, "The Upper San Pedro River and its surrounding habitat constitute a biological treasure chest, housing an astonishing number of mammals and reptiles, upland grasses, and native trees and shrubs. The river is the last undammed, free-flowing river in the southwest and, for the most part, flows year-round. Because it has not yet been dewatered, the San Pedro supports one of the few remaining riparian forests in the region, as well as a growing number of threatened and endangered species, including the Southwest willow flycatcher, a neo-tropical songbird, and the Huachuca water umbel, a semi-aquatic plant."

This Court has considered the impact of growth related to Fort Huachuca on the

San Pedro River once before, under the National Environmental Policy Act (NEPA). In 1995, this Court noted that "[i]t is hard to imagine anything more obvious than the impact of Sierra Vista's continued growth on the nearby San Pedro River and the federally protected and managed Riparian Area and species there." *Southwest Center for Biological Diversity v. Perry,* CIV 94–598 TUC ACM (Order filed August 30, 1995 at 21.) The Court concluded that "[c]reeping development and unrestrained draining of the aquifer represents a real threat to the Riparian Area" and that "[t]he Army must not turn a blind eye to this problem or to the fact that it its actions may tend to exacerbate it." (*Id.* at 21–22.)

Recognizing the significant threat posed by development and uncontrolled groundwater pumping and Fort Huachuca's responsibility for that threat, the Army entered into consultation with the FWS as required by § 7 of the ESA, 16 U.S.C. § 1536(a)(2). The FWS issued the Final BO on September 27, 1999, concluding that the Army's operations do not cause jeopardy to either the willow flycatcher of water umbel or cause adverse modification of their critical habitat on the San Pedro. (Administrative Record (Admin.Rec.), Exhibit (Ex.) 2: Final BO.) Under § 7, the Army must consult with the FWS on any prospective agency action where implementation "will likely affect" an endangered species. 16 U.S.S. § 1536(a)(3); 50 C.F.R. § 402.14(a). Following consultation, the FWS must issue a BO, setting forth detailed conclusions about how the action affects endangered species and critical habitat. If the FWS finds that the action will jeopardize a species or adversely modify critical habitat in violation of § 7, the FWS must suggest "reasonable and prudent alternatives (RPA) that, themselves, will not cause jeopardy to the species or adverse modification of critical habitat". 16 U.S.C. § 1536(b)(4)(A).

The FWS's decision to issue a "no jeopardy" Final BO was based on an agreement, the Memorandum of Agreement (MOA), entered into by the Army and the FWS after the Draft BO included a number of RPAs to address a finding of "jeopardy." The Army negotiated the MOA with the FWS as a way to amend the agency action to avoid a jeopardy finding and to avoid imposition of mandatory RPAs. The MOA replaced the RPAs in the Draft BO as the means for mitigating the impacts to the water umbel and the willow flycatcher, and provided the basis for the FWS's finding of "no jeopardy."

Here, the FWS's "no jeopardy" Final BO hinged on two things: 1) the MOA between the FWS and the Army, which outlined mitigation measures to protect the water umbel and willow flycatcher and 2) an Effluent Recharge Project in Sierra Vista designed to delay the impacts of deficit groundwater pumping.

Plaintiffs challenge the ability of these measures to protect the water umbel and willow flycatcher. Plaintiffs assert that the Final BO is flawed because it does not require any specific, enforceable measures to control creeping development or unrestrained groundwater pumping resulting directly or indirectly from Fort Huachuca's actions. As a result, it does not protect the San Pedro or its riparian-dependent species. Although the Army promises that in three years it will come up with a plan to address the groundwater deficit, in the meantime Army operations, which clearly have growth-inducing effects, are permitted to continue virtually unchanged. Specifically, Plaintiffs challenge the Final BO as follows:

*First,* its mitigation measures to avoid jeopardy are vague, entirely voluntary, and, even if implemented, do not come close to balancing the groundwater deficit and protecting the San Pedro River;

*Second,* it covers a 10–year period, which makes it arbitrarily and unlawfully restricted in scope;

*Third,* the effectiveness of one of the most important mitigation measures, the Sierra Vista Water Recharge Facility, is subject to substantial uncertainty; and

*Fourth,* there is no rational connection between the FWS's analysis of growth and its conclusion that the Fort's operations will not jeopardize or cause adverse modification to endangered species.

*Fifth,* the Army's reliance on the FWS's "no jeopardy" analysis was arbitrary and capricious and violated its duty under § 7 of the ESA to avoid jeopardy to the willow flycatcher and water umbel, and adverse modification of the critical habitat of the willow flycatcher. Section 7 of the ESA contains both procedural and substantive requirements which are intended to "insure that any action authorized, funded, or carried out by [an] agency (hereinafter ... referred to as an 'agency action') is not likely to jeopardize the continued existence" of a listed species of result in "destruction or adverse modification of [designated critical habitat]." 16 U.S.C. § 1536(a)(2). An agency action "jeopardizes the continued existence" of a threatened or endangered species when it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers or distribution of that species." 50 C.F.R. § 402.02. Destruction of adverse modification of critical habitat is defined as a "direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." *Id.*

█ The ESA makes no specific provision for judicial review of final agency actions, therefore, the scope of review of actions taken under the ESA are governed by the Administrative Procedures Act (APA). The BO represents a "final agency action" that is subject to review under the Administrative Procedures Act (APA). 5 U.S.C. § 702; *Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Under the APA, the Court is charged with conducting a "thorough, probing, in-depth review" of the entire record to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

█ An agency decision is arbitrary and capricious if "the agency has ... entirely failed to consider an important aspect of the problem." *Lake Mohave Boat Owners Ass'n v. National Park Service,* 138 F.3d 759, 763 (9th Cir.1998) (quoting *Dioxin/Organochlorine Center v. Clarke,* 57 F.3d 1517, 1525 (9th Cir.1995)). Alternatively, an agency decision may be overturned if there is no rational connection between the facts found and the choice made. *Pyramid Lake Paiute Tribe,* 898 F.2d at 1414.

█ The Court may not make up for deficiencies in the Final BO; nor may it supply a "reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Ins.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "An administrative decision involving the ESA will be set aside if the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or if the action is found to be without observance of the procedure required by law." *Tinoqui–Chalola Council of Kitanemuk and Yowlumne Tejon Indians v. United States Department of Energy,* 232 F.3d 1300, 1305 (9th Cir.2000) (*citing Nat-*

*ural Resources Defense Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir.1998), *cert. denied sub nom. Lower Tule River Irrigation Dist. v. Natural Resources Defense Council*, 526 U.S. 1111, 119 S.Ct. 1754, 143 L.Ed.2d 786 (1999)).

## C. *Defendants' Motion for Summary judgment Regarding Plaintiffs' APA Challenge*

Defendants, the Army, consulted with the FWS to determine the effects of Fort Huachuca's ongoing and future operations on endangered species and critical habitat. Fort Huachuca is located near Sierra Vista at the base of the Huachuca Mountains in Southern Arizona. The endangered and threatened species and critical habitat are in the Upper San Pedro River Basin and depend on the San Pedro River.

The Army performed a Biological Assessment (BA), which found that ongoing and programmed future military operations and activities of Fort Huachuca over the next ten years "may affect, but were not likely to adversely affect" the following species: Huachuca water umbel (off-post); Canelo Hills ladies' tresses; Southwestern willow flycatcher; loach minnow; and spikedace. (Admin.Rec.Ex. 3: BA at 6–1).[1] The FWS concurred in the "not likely to adversely affect" findings for the tresses, spikedace, and loach minnow, but disagreed with this determination for the water umbel (off-post) and the flycatcher. Accordingly, the FWS drafted a BO, which found that the operations of the Fort were not likely to adversely affect the endangered species in the area, except for the water umbel and flycatcher, and were not likely to adversely modify critical habitat, except for the flycatcher habitat. The

Draft BO was sent to the Army in 1998, and it included reasonable and prudent alternatives (RPAs) for the Army's proposed action to protect these two species and the flycatcher's habitat.

After receiving the Draft BO, the Army claims that it modified its proposed action so that it would not result in jeopardy to the water umbel and flycatcher, nor adversely modify the flycatcher's critical habitat. According to the Defendants, the RPAs contained in the Draft BO required the Army to address the entire region's water deficit problem, not just water deficits caused by Fort Huachuca. According to the Defendants, the Army did not have the resources nor the authority to perform the RPAs, which would mitigate the groundwater deficit for the entire region, so it proposed a collaborative approach to the problem. The Defendants submit that modifications had to be made to the Draft BO because the RPAs included provisions that the Army neither had funding nor authority to perform. The consultation regulations require RPAs to be both economically feasible and within the action agency's authority. 50 C.F.R. § 402.02.

The Army modified its proposed action to include a provision that it would join with other responsible entities in the region in a collaborative effort to balance groundwater deficits. The FWS considered this "new" proposed action and issued its Final BO, with a "no jeopardy" decision. The Army's commitment to collaborate with others in the region to reduce groundwater pumping is memorialized in several documents, which have been incorporated as part of the Final BO, as follows: 1) Appendix (App.) 1: the MOA; 2) App.

---

**1.** The BA also concluded that the Fort's operations were "likely to adversely affect" the water umbel (on-post); Blumer's dock, which was proposed as an endangered species at the time; Peregrine falcon, which was listed as endangered at the time; Mexican spotted owl; lesser long-nosed bat, and the Sonora tiger salamander. The Army concurred. (Admin.Rec.Ex. 3: Biological Assessment at 6–1.)

A: Army Water Resources Management Plan (AWRMP), and 3) Appendix B: Army Requirements from Current Formal Consultation (ARCFC).

The MOA provides that the Army will develop a water resource management plan for the Fort, as provided for in App. A, the AWRMP; the Army will participate in a regional planning organization, the Upper San Pedro Partnership (USPP) and its development of a regional water resource management plan (RWRMP), and the Army will submit its AWRMP for incorporation into the RWRMP.

 On September 27, 1999, the FWS issued the Final BO, which covers "all ongoing and planned military operations and activities at and nearby Fort Huachuca for ten years from the date of the Final BO." (Defendants' Crossmotion at 6.) The standard for challenging the FWS's Final BO is narrow; "the court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814. It does not matter whether or not this Court would have decided the issue differently; instead, the Court only determines whether the decision was based on "consideration of the relevant factors and whether there is a clear error of judgment." *Id.; see also Marsh*, 490 U.S. at 377, 109 S.Ct. 1851; *Baltimore Gas & Electric Co.*, 462 U.S. at 105, 103 S.Ct. 2246; *La Flamme*, 852 F.2d at 399. The relevant inquiry is whether or not there is a rational relationship between the relevant factors and the agency's decision. *Pyramid Lake Paiute Tribe*, 898 F.2d at 1413.

The Defendants explain that the consultation process is designed to provide back and forth negotiations between the action agency and the FWS so that the action agency may refine its project to ensure that jeopardy does not occur. *See e.g., Lone Rock Timber v. Department of Interior*, 842 F.Supp. 433, 440 (D.Or.1994) (the

purpose of consultation is to allow the agency to utilize the expertise of the FWS in assessing the impact of the proposed project and the feasibility of adopting reasonable alternatives). Correspondingly, the FWS may alter its analysis and proposed mitigation measures as the consultation process proceeds. Defendants argue that the Final BO is fully supported by the record and takes into consideration all the relevant factors, and that, therefore, it is irrelevant that the Draft BO found there would be an adverse affect on the water umbel and flycatcher, and on the flycatcher habitat.

The Draft BO is, however, relevant to analyze the Defendants' argument that it was necessary to revise the Draft BO, specifically the RPAs, to enable the Army to work collaboratively with other water users in the region to resolve water deficits in the San Pedro River Basin.

The first paragraph of the RPAs, asserts that they are "alternative actions, identified during formal consultation, that (1) can be implemented in a manner consistent with the intended purpose of the action, (2) can be implemented consistent with the scope of the action agency's legal authority and jurisdiction,(3) are economically and technologically feasible, and (4) would, the Service believes, avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat." (Admin.Rec.Ex. 32: Draft BO at 116.) If Defendants are correct, this assertion is false.

The Draft BO segregated the RPAs into four primary tasks, which required the Army to prepare and implement, within three years, a water and habitat management plan to address the deficit in the water budget and threats to the San Pedro River. The plan objectives were twofold: 1) to balance water use with recharge at

Fort Huachuca, and 2) to provide technical and financial assistance to other water users in a regional effort to conserve water or enhance recharge on and off post, so that when taken together, the measures identified in the plan would negate on-post and off-post interrelated/interdependent and cumulative effects. (Admin.Rec.Ex. 32: Draft BO at 116.)

The RPAs required implementation of the plan to be timely to prevent further significant depletion of flows in the San Pedro River and adverse effects to the water umbel, willow flycatcher, and critical habitat. The details of the plan were to depend upon an evaluation of the technical and economic feasibility of management options and the willingness of partners, such as the City of Sierra Vista and Cochise County, to work with the Fort and the FWS to develop a solution for protecting the San Pedro River. (Admin.Rec.Ex. 32: Draft BO at 116.)

The four tasks were as follows:

*Task # 1* addressed the first objective of balancing on-base water use with recharge, and required the plan to include a schedule for implementation, as soon as possible, of measures that would result in groundwater withdrawals less than or equal to recharge on Fort Huachuca.

The mechanisms to achieve the plan objectives were at the discretion of the Army, but it was required to consider the following measures: a) improvements to the irrigations conservation plan to save an additional 200 acre-feet of water per year; b) watershed improvement plan for the East Range; c) to study and implement recommendations to increase groundwater recharge by 1,000 acre-feet per year; d) reuse or recharge all effluent generated on Fort to result in a savings of at least 460 acre-feet per year; e) eliminate irrigation at the Fort's golf course; f) halting

all commercial and industrial uses of Garden Canyon spring water, and g) other water conservation or enhanced recharge measures.

*Task # 1* addressed the second objective of balancing regional water use and involved financial and/or technical assistance to local governments for projects to offset effects of interrelated/interdependent activities on and off post, such as: a) a surface flow recharge project in Sierra Vista; b) retiring available agricultural lands; c) measures to improve watershed conditions; d) diverting flows of the San Pedro River into the St. David ditch to obtain a net gain in baseflow; e) water conservation programs; f) developing a buffer near the river to prevent new water extractions; g) treating effluent from Sierra Vista wastewater treatment plant to reduce pumping of groundwater; h) pumping water from outside the flood-plain and dumping it into the river to sustain flows during the dry season; i) funding operation and maintenance of Sierra Vista's effluent recharge project after 2020, and j) other measures proposed by USPP. In the event the Army lacked authority to implement one or more of these alternatives, it was required to transfer funds to the FWS or a third party, which could perform the task.

*Task # 2* required the Army to take specific measures to address threats to the water umbel on Fort Huachuca,

*Task # 3* required the Army to assist others in the region, such as the BLM, the Coronado National Forest and private land owners, in managing water umbel habitat potentially affected by the Army's proposed actions. Assistance was to be in the form of funding and/or technical assistance in the amount of $500,000 over the next ten years.

*Task #4* required the Army to monitor the endangered species and monitor and report progress/results of implementation of the RPAs. (Admin.Rec.Ex. 32: Draft BO at 116–121.)

In Task #1, the FWS recognized that a long-term sustainable solution required all water users in the region to participate in a "well coordinated, comprehensive basin-wide plan. Fort Huachuca cannot solve the problem alone, but must be the leader in the coordination of a comprehensive solution." (Admin.Rec.Ex. 32: Draft BO at 119.) Task #3 called for collaboration between the Army and others, and Task #1 noted, "Implementation of some measures is contingent upon willing participation of management partners, such as local governments." (Admin.Rec.Ex. 32: Draft BO at 118.) Task #1 required the Fort to work with other water users, including providing financial and technical support to efforts offsetting interrelated, interdependent, and cumulative effects on the water umbel and willow flycatcher. (Admin.Rec.Ex. 32: Draft BO at 118.) Under the plain language of the Draft BO, the Army was not required to single-handedly remedy the groundwater deficit for the entire subwatershed.[2]

The Final BO mirrors the RPAs contained in the Draft BO.App. 1, the MOA to the Final BO, like Task #1 of the RPAs, requires that within three years, the Army must prepare a plan for the Army, the AWRMP, to identify potential water conservation, effluent reuse and recharge projects. (Admin.Rec.Ex. 32: Draft BO at 117–119; Ex. 2: Final BO, App. 1, MOA at 4.) App. 1, the MOA to the Final BO, like Task #1 of the RPAs, requires the Army to participate in the USPP to develop a regional water resource management plan, the AWRMP. (Admin.Rec.Ex. 2: Final BO, App. 1, MOA at 4.) App. 1, the MOA

to the Final BO, like Task #1 of the RPAs, requires the Army to submit the AWRMP to the USPP for adoption into the regional plan. (Admin.Rec.Ex. 2: Final BO, App. 1, MOA at 2.)

Projects similar to those listed in Task #1 of the RPAs are included in App. A. the AWRMP, as conservation, recharge and effluent reuse projects. (Admin.Rec.Ex. 2: Final BO, App. A, AWRMP.) Task #4 of the RPAs and the MOA require the Army to participate in and support surveys, censuses, and population monitoring of endangered and threatened species, and critical habitats, and conduct research. (Admin.Rec.Ex. 2: Final BO, App. 1, MOA at 4; App. A, AWRMP at I(c), VII.) Task #1 and the MOA authorize the transfer of funds to support the Army's collaborative efforts off-base. The Draft BO, tasks #2 and #3 were included in their entireties in the Final BO, App. B, the ARCFC, except that Appendix B omits a $500,000 appropriation found in Task #3. (Admin.Rec.Ex. 2: Final BO, App. B, ARCFC at 1–2.)

The similarity between the provisions in the Draft BO and the Final BO, belie the Defendants' assertion that the Draft BO had to be modified because of a lack of authority to participate, implement, or fund the RPAs. Defendants offer no evidence regarding their assertions nor explain why the Army has funding authority under the MOA, but not the RPAs, nor do they explain why the Army may participate in a regional collaborative effort under the MOA, but may not take the leadership role assigned it pursuant to the RPAs. It seems more likely that the modifications in the Draft BO were, as Plaintiffs assert, to sidestep specific substantive requirements contained in the RPAs that are missing from the Final BO.

2. See n. 3.

For example, Task # 1 in the RPAs required the Army to prepare a plan (or AWRMP) to balance on-base water use with recharge and required the plan to include a schedule for implementation, as soon as possible, of measures that would result in groundwater withdrawals less than or equal to recharge on Fort Huachuca. Task # 1 included a list of measures the Army had to consider in its quest to balance water use, as follows: "improvement to the irrigation conservation plan to save an additional 200 acre-feet of water per year;" "complete studies and implement recommendations to increase groundwater recharge by 1,000 acre-feet per year," "reuse or recharge all effluent generated on the Fort, resulting in a savings of at lease 460 acre-feet per year;" "eliminate irrigation at Fort Huachuca's golf course;" "halt all commercial and industrial uses of Garden Canyon spring water;" "provide financial and/or technical assistance to Sierra Vista to implement as soon as possible a surface flow recharge project that would capture and provide for use or recharge up to 6,100 acre-feet of water per year;" "fund operation and maintenance of Sierra Vista's effluent recharge project," and "provide financial and or technical assistance to other water users in developing and implementing various other remedies to the regional problem." (Admin.Rec.Ex. 32: Draft BO at 118.)

Plaintiffs assert that "[i]n contrast to the specific nature of the FWS's proposed RPA's, the final mitigation measures in the MOA related to groundwater protection are vague, largely voluntary, and dependent on available funding."[3] (AdminRec.Ex. 2: Final BO, App. 1, MOA.) Defendants respond that the draft proposal is not relevant to the Court's evaluation of the Final BO. In the Ninth Circuit, a Final BO that is less protective than the Draft BO does not violate the ESA. *Southwest Center for Biological Diversity v. Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir.1998). The Secretary is not required to pick the first reasonable alternative formulated in the RPAs, nor is the Secretary even required to pick the best alternative. *Id.* "The agency decision need not be ideal . . . so long as the agency gave at least minimal consideration to the relevant facts contained in the record." *Id.* (*citing Center for Marine Conservation v. Brown*, 917

---

**3.** There are more similarities than differences between the two biological opinions. Both the Draft and Final BO included detailed breakdowns of the interrelated and interdependent effects on the water umbel and willow flycatcher attributable to Fort Huachuca. *See e.g.,* (Admin.Rec.Ex. 32: Draft BO at 108–110) (approximately 82% of groundwater pumping is attributable to direct, indirect, and interrelated/interdependent effects of Fort Huachuca); (Admin.Rec.Ex. 32: Final BO at 114–117) (approximately 54–62% of groundwater pumping is attributable to direct, indirect, and interrelated/interdependent effects of Fort Huachuca).

Both the Draft and Final BO included the same assessment regarding the cumulative effects of groundwater pumping. They estimated that the population and employment at Fort Huachuca was expected to remain fairly constant, but the population in the Sierra Vista subwatershed is expected to increase from the 1990 estimate of 51,400 to 73,900 in 2030. (Admin.Rec.Ex. 2: Final BO at 111, 118.) "Because the Fort is not expected to grow, this increase cannot be attributed to the Fort; although it is not possible to predict how growth in the subwatershed might be affected if the Fort was not present." Both, concluded that growth in the area has achieved momentum that is separate from any influence Fort Huachuca might have. (Admin.Rec.Ex. 32: Draft BO at 111, 118–119.)

In both opinions, the FWS recognized there was a regional problem which was best resolved through collaboration and did not require the Army to remedy the groundwater deficit for the entire subwatershed.

F.Supp. 1128, 1143 (S.D.Tex.1996)). The relevant inquiry is whether the "no jeopardy" finding in the Final BO is supported by the record.

The Final BO requires the Army to develop and implement a plan, the AWRMP, to protect and maintain populations of listed species and habitats and requires the Army to participate with others in the development of a Regional Water Resources Plan, the RWRMP, to maintain baseflows in the upper San Pedro River sufficient to sustain protected species and habitats. (Admin.Rec.Ex. 2: Final BO at 122, 123; App. A, AWRMP at 1.) Under the Final BO, it is the regional plan, not the Fort's three year plan, that results in balancing water deficits.

The Final BO gives the Army three years to prepare the AWRMP, identifying potential water conservation and effluent reuse and recharge projects for implementation. (Admin.Rec.Ex. 2: Final BO, App. 1, MOA at 5(c)(1), pg 4.) While the Army must implement some or all of the proposed projects found in App. A, the AWRMP, (Admin.Rec.Ex. 2: Final BO, App. 1, MOA at 5(c)(11), pgs. 4–5), the projects listed in App. A lack specifications to quantify the remedial value of each project. The Army must actively participate in the USPP, and its development of a regional plan, RWRMP, for the subwatershed, including providing funding, technical assistance, and other support as needed for the USPP to complete and begin implementation of the RWRMP within three years. (Admin.Rec.Ex. 2: Final BO, App. A, AWRMP at IV; Final BO, App. 1, MOA at 5(c)(8), pg. 4); see also, (AdminRec.Ex. 2: Final BO, App. A, AWRMP at VII) (the Army must continue supporting hydrological research in the subwatershed); (AdminRec.Ex. 2: Final BO, App. A, AWRMP at I(C)) (and develop a monitoring program). The Army must conduct, assist, and/or support surveys, censuses, and population monitoring of endangered and threatened species, and critical habitat. (Admin.Rec.Ex. 2; Final BO, App. 1, MOA at 5(c)(4)–(6), pg. 4.)

The FWS must annually review the AWRMP. (Admin.Rec.Ex. 2: Final BO, App. 1, MOA at 5(b)(2), pg. 3.) The Army must prepare a written annual report for the FWS, documenting the progress and results of proposed projects. (Admin.Rec.Ex. 2: Final BO, App. A, AWRMP at IX.) Every year, within two months of Fort Huachuca receiving its annual environmental operating budget, the MOA requires the Army and the FWS must jointly develop an annual work plan to identify actions for implementation. (Admin.Rec.Ex. 2: Final BO, App. 1, MOA at ¶ 5(a)(9), pg. 3.)

The Final BO incorporated these requirements as mitigating factors to its proposed action, and the FWS issued its decision of "no jeopardy" for the following reasons: the Fort had committed to developing an Army Water Resources Management Plan (AWRMP) and to participating in the development of a Regional Water Resources Management Plan (RWRMP) with other water users in the subwatershed, (Admin.Rec. at Ex. 2: Final BO at 122–123), and because of an effluent recharge project being developed in Sierra Vista, which was expected to delay the effects of groundwater pumping for perhaps as long as 20 years, (Admin.Rec. at Ex. 2: Final BO at 122–123).

The FWS explained that although the Sierra Vista effluent recharge project will not alleviate the long-term threat to water umbel habitat on the San Pedro River, it is expected to "provide time to develop and implement plans to address those long-term threats before further impacts to the water umbel or its critical habitat occur." (Admin.Rec.Ex. 2: Final BO at 123.) The Final BO concluded, as follows:

The Service's findings that the proposed action is not likely to jeopardize the continued existence of the water umbel or result in adverse modification or destruction of critical habitat are based entirely on the successful and prompt implementation of the Sierra Vista effluent recharge project to avoid near-term impacts, the Fort's commitment to develop and implement water resources planning to protect in the long-term the water umbel and its habitat on the San Pedro River, and the Fort's proposed mitigation measures to protect the species and its habitat on-post. If these plans and mitigation measures are not implemented on schedule or do not reduce or eliminate adverse effects as predicted herein, then reinitiation of consultation is warranted and the Service would need to reevaluate its conclusion.

(Admin.Rec.Ex. 2: Final BO at 123) (citing 50 C.F.R. § 402.16 (b and c).)

The development and implementation of the AWRMP and the RWRMP, and the Sierra Vista effluent recharge project, were critical to the "no jeopardy" finding, as follows:

Taken together, they provide a framework for Fort Huachuca to work with other agencies, the City of Sierra Vista, and others to protect water umbel populations and critical habitat. The Service believes the Fort will be successful in developing with others in the basin water management plans within three years that, when implemented, would protect water umbel populations and critical habitat. If the effluent recharge project works as anticipated herein, effects to the river from groundwater pumping should be delayed long enough to devise and implement these plans before the water umbel or its critical habitat are significantly affected.

(Admin.Rec.Ex. 2: Final BO at 123); *see also* (Admin.Rec.Ex. 2: Final BO at 122)

(the Final BO established that even with the successful implementation of all the proposed mitigation measures, even under optimistic conditions, water use in the aquifer will exceed supply and result in continuing growth in the already very large cone of depression under Fort Huachuca and Sierra Vista); (Admin.Rec.Ex. 2: Final BO at 122) (while the recharge project, if it is constructed and operated as expected, may insulate the river from the effects of groundwater pumping for perhaps as long as 20 years, ultimately, as long as the water budget is in deficit water umbel populations and critical habitat are threatened).

■ To avoid a substantive violation of the prohibition against jeopardy, the agency must develop mitigation measures—either as part of the proposed project or as RPAs in the biological opinion. 16 U.S.C. § 1536(a)(2). Mitigation measures must be reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise—enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards. *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir.1987). The question before this Court is whether or not the Final BO meets these criteria.

**D.** *Analysis: The Final BO is Arbitrary, Capricious, and not in Accordance with Law*

■ The Final BO does not require the Army to balance its water use on base or in the subwatershed. (Admin.Rec.Ex 2: Final BO, App. 1., MOA,) It requires the Army to develop and implement a plan, the AWRMP, to protect and maintain populations of listed species and habitats; it is the Regional Water Resources Plan, the RWRMP, that is designed to maintain the baseflows in the upper San Pedro River sufficient to sustain the protected species

and habitats. (Admin.Rec.Ex. 2: Final BO at 122, 123; App. A: AWRMP at 1.) The Army is only required to participate in the USPP, an organizational partnership, aimed at identifying a regional solution to the water deficit problems of the San Pedro River Basin. Under the Final BO, the Army must support the USPP in the development and adoption of a regional water management plan, the RWRMP, within three years. The Army has no authority, however, over the implementation of this mitigation measure. The Court notes that this was Defendants objection to the RPAs included in the Draft BO.

There are no requirements in the Final BO to reduce reliance on groundwater pumping by any particular amount or to achieve any measurable goals with respect to water recharge. (Admin.Rec.Ex. 2: Final BO, App. A: MOA) There is no date certain implementation requirement. The MOA includes a laundry list of possible mitigation measures related to water conservation and recharge that the Army may implement, *id.*, but it does not establish which projects have to be undertaken, when, nor what the conservation objectives are for the respective projects. Without such specificity, the mitigation measures in the Final BO are merely suggestions. In combination with the provision to balance groundwater pumping through the RWRMP, the Final BO enables the Army to sidestep any direct responsibility for addressing deficit groundwater pumping.

The following comments made during the consultation process by the FWS staff are reflective of why there is no factual basis to support the FWS's decision of "no jeopardy:"

"It doesn't even come close" to mitigating the jeopardy/adverse modification

decision because the "only somewhat substantive commitment by the Fort is to reduce net water use by 600 acre feet; however, they don't say for sure how this will be done and implementation is 'subject to available funding.'" (Admin.Rec.Ex. 37: Rorabaugh to Harlow and Gatz email, 4/16/99).

"The measures listed in Appendix A (which would make up the AWRMP if we go with what is currently on the table, as you suggest) would save about 600 acre-feet per year. The Fort's net use is properly about 1,900 acre feet per year. So, unless additional measures are developed the Fort would not be mitigating 'their own impact on the sub-watershed's water resources' and of course this does not begin to address off-post pumping attributable to Fort Huachuca." (Admin.Rec.Ex. 6: email fr. Rorabaugh to Hessil, 11/15/99.)

The Defendants admit that even if all of the mitigation measures included in the Final BO, are taken together and under the best case scenario, water use in the aquifer will exceed supply and result in continuing growth in the already very large cone of depression under Fort Huachuca and Sierra Vista, until groundwater pumping is balanced in the region. (Admin.Rec.Ex. 2: Final BO at 122.) Plaintiffs give numerous examples, supported by the record, of the Final BO's inability to mitigate the water deficit problems resulting from and related to the Army's proposed operations. *See* (Admin.Rec.Ex. 2: Final BO at 105–109, 121–124) (even in the best case scenario, the mitigation measures will not eliminate even the current 7000 acre-feet groundwater deficit, much less the 13,000 acre-feet deficit that is expected to exist by 2030).[4]

4. The Army proposes mitigation measures for saving 600 acre-feet of water per year and if the Sierra Vista Water Recharge project is successfully implemented, the deficit reduc-

tions may be about 2,000–3,800 acre-feet per year, which falls far short of balancing even the existing 7000 acre-feet annual deficit. *See*

The whole premise of the "no jeopardy" ruling, which is that within three years the Army and other interested parties will come up with a long-term plan to remedy the groundwater deficit problem, is an admission that what is currently on the table as far as mitigation measures is inadequate to support the FWS's "no jeopardy" decision. The FWS is looking to the plans, the AWRMP and the RWRMP, to be prepared within three years, to identify the necessary mitigation measures, which will prevent adverse impact to the water umbel and willow flycatcher. These measures, however, have to be identified and included in the Final BO, either as RPAs or incorporated into the Army's proposed action, to support a "no jeopardy" decision. Without these measures, there is no factual basis and no rational basis for the opinion.

The Army may not delay identifying the measures necessary to mitigate the effects of its ten-year plan based on the monitoring provisions in the Final BO nor on the short-term benefits of the Sierra Vista recharge project.

The Final BO's monitoring requirements do not measure the success or failure of the on-base and/or regional mitigation measures to reduce the groundwater deficit. It only requires the Army to develop "a monitoring program designed to assess progress," (Ps' SOF at Ex. 2: MOA, App. A at 1), and requires an annual review of the AWRMP, as to which projects have been implemented the past year and which are to be implemented in the coming year. Especially since the Final BO and the AWRMP fail to quantify the remedial value of the proposed projects, simply reporting project implementation is not a mean-

ingful assessment of the success or failure of the mitigation measures in protecting the water umbel, willow flycatcher, and critical habitat from adverse impact. Such an assessment would require systematic monitoring of either San Pedro baseflows or the groundwater aquifer.

█ Even if the Final BO provided a meaningful monitoring mechanism to annually assess whether or not the San Pedro baseflow or aquifer was or was not being adversely affected, this is not a proper way to mitigate adverse impact. This type of analysis permits the Army to continue deficit-inducing operations when a longer-term analysis would reveal those operations to be causing jeopardy.

FWS also bases its "no jeopardy" opinion on the Sierra Vista Water Recharge Project, which is under construction and designed to capture treated wastewater and sewage in large infiltration ponds so that the city's effluent will seep into the groundwater and recharge the aquifer. (Admin.Rec.Ex. 5: Planning Aid Memorandum at 10.) Assuming the project is successful, its positive effects will be short-term and inadequate. It will recharge roughly 1,516 acre-feet per year from 2000 to 2010 and 1,762 acre-feet per year from 2010 to 2020, a small fraction of the growing deficit. (Admin.Rec.Ex. 2: BO at 93; Ex 48: Rorabaugh to Hessil email, 11/9/98.) At this point, Sierra Vista is obligated to recharge its effluent only until 2020, reducing impacts to endangered species for 20 years at the most. (Admin.Rec.Ex. 47: Biological Assessment, San Pedro River Wastewater Effluent Recharge Project at 3.)

(Admin.Rec.Ex 2: BO at 105–107, 122) (At the best, these measures could cut the current deficit by about 56 percent, but balancing withdrawals/outflow with recharge/inflow would require implementation of additional

measures). "Without a balancing of the water budget, the cone of depression will continue to grow and continue to pose a long-term threat to flows in the San Pedro River." (Admin.Rec.Ex. 2: Final BO at 107.)

This recharge project is not intended to compensate for or mitigate the effects of groundwater pumping. The project is designed to create a "mound" of groundwater between the cone of depression and the river that will, in theory, prevent baseflow from the San Pedro from flowing back into the groundwater during the next twenty years. (Admin.Rec.Ex. 5: Planning Aid Memorandum at 10.) This will delay and mask the effects of the deficit groundwater pumping, (Admin.Rec.Ex. 2: Final BO at 121), but this is not a mitigating factor in relation to the Army's ten-year plan. While the FWS has argued that the recharge project will delay impacts for at least three years, it has not presented any evidence regarding the projects ability to mitigate the effects of a lesser proposed agency action, such as the Army's operations and activities planned over the next three years. *See also, National Wildlife Federation v. Coleman,* 529 F.2d 359, 374 (5th Cir.1976) (proposed action of other agencies may not be relied on to mitigate impact, especially if other agency's action is not sufficient to make up for the loss of habitat caused by the federal agency).

The ESA mandates that the biological opinion analyze the entire agency action to ensure that the action is fully protective of the endangered species and its habitat. 16 U.S.C. § 1536(b)(3)(A). The scope of the agency action is critical to whether the consultation process considers all the effects of the action and adequately mitigates potential impacts. Courts have consistently held that a biological opinion has to "analyze the effect of the *entire* agency action," *Conner v. Burford,* 848 F.2d 1441, 1453 (9th Cir.1988), *cert. denied, Sun Exploration & Production v. Lujan,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989) (emphasis added), including all indirect and cumulative affects of the action on threatened and endangered species, 50 C.F.R. § 402.14(g)(3); 50 C.F.R. § 402.02. An agency may not ignore future aspects

of a federal action by segmenting that action into phases. In fact, in *Conner,* the Court held that all phases of oil and gas leasing had to be evaluated for potential impacts at the leasing stage, even though the final phase—construction of oil and gas wells—was uncertain to occur. *Conner,* 848 F.2d at 1453–1458; *See also North Slope Borough v. Andrus,* 642 F.2d 589, 608 (D.C.Cir.1980) (agency may not deal exclusively with one stage of the project).

In *Conner,* the FWS issued a biological opinion only with regard to the leasing stage because it did not have sufficient data to render a comprehensive opinion beyond the initial leasing phase. Instead of issuing a comprehensive biological opinion, the FWS concluded that the leasing phase did not jeopardize endangered species. The FWS envisioned an "incremental-step consultation approach", with additional biological evaluations prior to subsequent activities. The court rejected this. The fact that insufficient evidence was available did not excuse the FWS from rendering a comprehensive opinion on the entire agency action. The court explained, as follows:

> Although we recognize that the precise location and extent of future oil and gas activities were unknown at the time, extensive information about the behavior and habitat of the species in the areas covered by the leases was available ... We agree with appellees that incomplete information about post-leasing activities does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available.

*Conner,* 848 F.2d at 1453–1454.

This is not the type of case that can be distinguished from *Conner.* This is not like *Swan v. Turner,* 824 F.Supp. 923, 932 (D.Mont.1992), where FWS structured its review, envisioning future ESA evaluations

at the developmental stages of specific projects, after adoption of the biological opinion, which included standards and guidelines to protect species and habitat. Here, the Final BO covers all proposed activities and projects planned at Fort Huachuca over the next ten years, without including standards and guidelines. These will be developed and implemented in three years. The Court also rejects the notion that the annual review requirement, combined with the Army's obligation to reinitiate consultation in the event that mitigation measures are not as effective as anticipated, supports a staged analysis of jeopardy and relieves the FWS of performing a comprehensive biological opinion at this time.

■■■ Generally, the period covered by a biological opinion is defined by the life of the project or agency action. In this case, the actions consist of on-going activities scheduled to occur over the next ten years at Fort Huachuca. So, the breadth and scope of the analysis must be adequate to consider all the impacts that are likely to jeopardize the species or adversely modify critical habitat, which can be anticipated for these projects using the best available science. In assessing jeopardy, each agency shall use the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2). Looking at the best scientific and commercial date available is a standard that requires far less than conclusive proof. *Greenpeace v. National Marine Fisheries Service*, 55 F.Supp.2d 1248, 1262 (W.D.Wash.1999). This standard recognizes that better scientific evidence will most likely always be available in the future.

The FWS must consider the Army's ongoing and programed operations and activities planned for Fort Huachuca over the next ten years and assess the impacts of those operations based on the best scientific evidence available today, not 3 years from now. Essentially, the FWS has at-tempted to sidestepped its obligation to make an accurate "no jeopardy" decision based on the best available evidence and seeks to postpone, for three years, this assessment which must be made as part of the process of issuing the Final BO. This, it cannot do.

Because the Final BO is inadequate as a matter of law, the Court does not address the Plaintiffs' other challenges, such as: "there is no rational connection between the FWS's analysis of growth and its conclusion the Fort's operations will not jeopardize or cause adverse modification to endangered species." (Ps' MSJ at 3, 46–49.)

E. *Analysis: Fort Huachuca Operations are Likely to Result in Jeopardy to the Water Umbel and the Willow Flycatcher*

■■■ The ESA affords endangers species "the highest of priorities," *TVA v. Hill*, 437 U.S. 153, 174, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The ESA, therefore, imposes an absolute prohibition on any federal action that is likely to jeopardize the continued existence of a listed species or result in adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). The FWS must not authorize any action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species by reducing the reproduction, numbers, and distribution of the species. The ESA does not, however, give the FWS a veto power over the actions of other federal agencies. *National Wildlife Federation v. Coleman*, 529 F.2d 359, 371 (5th Cir.1976), *cert. denied. Boteler v. National Wildlife Federation*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976).

■■■ After consulting with the FWS, the federal agency involved must determine whether it has taken all necessary action to insure that its actions will not

jeopardize the continued existence of an endangered species or destroy or modify habitat critical to the existence of the species. *Id.* In other words, under the ESA, the Army has an independent duty to insure that its actions satisfy § 7 and the jeopardy standard. 16 U.S.C. § 1536(a)(2).

■ "Following the issuance of a Biological Opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Services's biological opinion." 50 C.F.R. 402.15(a). The Ninth Circuit has explained that "[c]onsulting with the Service alone does not satisfy an agency's duty under the Endangered Species Act. An agency cannot 'abrogate its responsibility to ensure that its actions will not jeopardize a listed species; its decision to rely on a Service biological opinion must not have been arbitrary or capricious.'" *Resources Limited, Inc. v. Robertson,* 35 F.3d 1300, 1304 (9th Cir. 1994) (quoting *Pyramid Lake Paiute Tribe,* 898 F.2d at 1414).

■ Here, the Final BO failed to include the necessary mitigation measures to address the long term adverse impacts of the Army's proposed activities over the next ten years. Instead, the Final BO proposed to identify mitigation measures within three years. As a matter of law, the Final BO omitted a critical component.

The Army knew of the need to take immediate and drastic measures to maintain flows in the San Pedro River. (Admin.Rec.Ex. 30: e-mail fr. Hessil to Rorabaugh, 6/30/98.) The Army, however, refused to commit to any specific mitigation measures related to its groundwater use or to balance water use on base, much less in the Sierra Vista subwatershed. *See* (Admin.Rec.Ex. 46: email fr. Spotila to Green, 8/29/99) (recognizing that the Fort Huachuca golf course is the "soft engineering underbelly of the water problem on base", but insisting on maintaining and irrigating it.) Instead, the Army sought to rely on the FWS's arbitrary and capricious determination that its action was not likely to cause jeopardy. The Army committed a clear error in judgment when it relied on the Final BO, which failed to consider all the relevant factors.

**Accordingly,**

**IT IS ORDERED** that the Plaintiffs' Motion for Summary Judgment (document 35) is GRANTED; declaratory judgment is warranted because the Final BO is arbitrary and capricious and in violation of the ESA. Declaratory judgment is also warranted against the Army for violating its independent duty under § 7 of the ESA to not cause jeopardy or adverse modification to endangered species and critical habitat.

**IT IS FURTHER ORDERED** that the Defendants' Crossmotion for Summary Judgment (document 39) is DENIED.

**IT IS FURTHER ORDERED** that the Defendants–Intervenor's Motion for Summary Judgment (document 53) is DENIED.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment according.